Good morning. May it please the court. My name is Mario Valencia. I represent the defendant, Chao Fan Xu in this case, and with me here at the table are Mark Picker. He represents, I don't know if I'm gonna say this name right, Guo Jun Xu, and then there's Lauren Graham, and he represents Yu Ying Yai, Ying Yi Yu, and Chad Bowers. He represents Quang Nguyen Phan. Very good. Now, how have you divided the time? Well, what we've decided to do is I'll start out, and then after me, as far as time is, I'll address some of the conspiracy arguments that we've raised, as well as the sentencing issues in particular, the establishment of $482 million, and then Mr. Graham will go next, and he will address, if the court's interested, the jury instruction issues and depositions, trial by deposition issues that were raised, and then it'll be Mr. Bowers, and he will address, if the court would like, the issues raised as far as expert last. He would like to do rebuttal, he said, and address any other issues that the court may want. How much time do you want to save for rebuttal? How much time do you want? Four or five minutes? Now, you should pay attention, everybody, to the clock when you get down to four minutes. Sit down, or you'll cut off Mr. Bowers' time. Okay. I really appreciate that. As I stated, then, I'm here to present the issues as far as the conspiracies and the sentencing issue, whether or not $482 million was actually shown by clear and convincing evidence at the trial, and so I'd like to start out by talking about the conspiracy issues, in the second superseding indictment. I have a question. Is there any direct evidence of an agreement with respect to those two counts? There is not, Your Honor, and that's a very good point. That's something that I don't know that came out very clearly in the briefs, but there is not. There is no evidence of a conspiracy to launder this money. As a matter of fact, there were two witnesses that they deposed from China that were supposedly co-conspirators, a guy by the name of Hong Bin. There was, well, sorry to cut you off, but it seems like there was a lot of evidence, though, relating to the transactions that occurred with respect to these counts and all of the activity. Could the jury not reasonably infer an agreement from all of that evidence? An agreement to launder the money? Yes. No. They could not have reasonably inferred that, and here's why, because, in fact, when you take a look at what they were doing, well, first of all, it's such a complicated case, but in reality, Everjoint Company, which was the company set up in Hong Kong, was engaged in legitimate business. It did business with Kaiping Polyester Factory, which was a state-owned factory back in Kaiping. It did business with Zongwei Company, I don't know if I'm pronouncing that right, which was another legitimate business set up in Kaiping. It was a subsidiary of the Kaiping Polyester Factory. It was a joint venture between the Bank of China in Kaiping and the Kaiping Polyester Factory. Is there undisputed evidence that there was clean money as well as stolen money in the Everjoint account? Yes, absolutely, and the reason for that is exactly what I was explaining, is that Everjoint actually provided goods and materials to Kaiping Polyester Factory and Zongwei, the subsidiary back in Kaiping, for them to do different things, their businesses. So, for example, there was money that was loaned out to Zongwei and Kaiping from the Bank of China, and then they would go back and use that money to pay Everjoint. Everjoint Company also was engaged in There was evidence conflicting about whether or not, I should point out also that at the time, not only was Everjoint set up with approval by the local government, the vice mayor of the local government actually took out loans from Everjoint Company, was a shareholder in Everjoint Company, and then further up the chain, I can't remember if it was the Jiangmen Branch or if it was actually the Guangdong Province Bank, but whoever was the manager there was a gentleman by the name of Wang Lin, I think is how he pronounces it. He also knew about Everjoint, and his two daughters worked at Everjoint. So, they did legitimate businesses with companies back in China, and money was sent to them for those purposes. But wasn't there evidence that the defendants committed fraud and deposited much of these proceeds into Everjoint, and then significant funds were later drawn from Everjoint and brought to the United States? Is that true or not? No, that's not true. There is no evidence that, first of all, there's no evidence that significant funds, I should put it this way, let's start back, that there was a scheme to defraud the Bank of China from $500 million or $482 million, transfer it to Hong Kong, and then in Hong Kong somehow later, transfer $482 million to the United States so that they could live like kings. In fact, what happens in the testimony was that these guys started Everjoint back in the 90s because they were going to want to improve their own employees' benefits and make some money. The money that was going to be brought, the profits that were made from engaging in foreign exchange trading were then sent back to the Kaiping branch and then were used by Kaiping Polyester Factory and Zhonghuai to build buildings, to do business, to do other things. As a matter of fact, the building where the Bank of China and Kaiping is currently housed, is my understanding, was built by the Kaiping factory and funded from money that was used for foreign exchange trading, as was a hotel that's there called the Everjoint Peninsula Hotel. You're losing me a hair a little bit. So you're saying there was no wrongdoing at all on the part of your client? What I'm saying is there certainly wasn't any fraud. Now whether or not there was money that was transferred out of accounts to cover up certain things that may have been improper, maybe according to the Bank of China, that may be the case. But certainly it was not established, and I have extensive notes, but because of the time, as to the chart that they put down, how I could show that each one of those figures, and if the court would like, I to how this money was not used in an improper way. And the other thing to remember is when the Bank of China did the audit in 2001, which ultimately led supposedly to this discovering of this fraud, they only limited their audit to the records at the Kaiping branch. So for example, they jumped to certain conclusions. They'll say, for example, there was $95 million in 1998, they say, that was loaned out to Kaiping Factory and Zhongwei. Well, those were improper because they were out-of-book loans. And then the money went directly then to EverJoint. But as I just pointed out, EverJoint was in a legitimate business with Zhongwei and Kaiping, providing them with goods and materials. So the fact that a bank would loan Kaiping Factory, the polyester factory, or Zhongwei $5 million, that shows right on the documents that were then transferred, that then that money was going to go to EverJoint because of goods or materials that were provided, in no way establishes fraud. So what they do is they come in and say, well, that was improper because there wasn't supporting documents on these loans, these $95 million loans. There wasn't any supporting documents to show what the goods and the materials were. But they're asked, the questions were asked of the witnesses. Well, did you go to EverJoint? Well, no. Do you know what kind of business EverJoint does? No, we didn't care what they did. They're asked, well, did you go to Kaiping Polyester Factory or Zhongwei Factory and ask them for any supporting documentation to show that materials and goods were provided? And again, their response is no. So they just limited it to what they had there. Let me ask you another question because of the time. But I mean, your clients were convicted after the jury trial of laundering of monetary instruments under 18 U.S.C. Section 1956. I guess I want to know your position. Would you agree that we do not or the law does not require tracing under 1956 and that evidence of a commingled account will suffice? I know you don't think there was any commingling, but I just want to know your position with respect to that in case we do get to that point. With the tracing? And whether if it was commingled, is tracing required? Well, and I think we, honestly, there's so much to this case that I've been studying over the last little while to try and get it right. I remember the arguments that we raised and that the government raised. And in the reply... Or is it applicable to the conspiracy? The tracing? I mean... Yes. Our position is that it would be required for them to trace it. If you cannot trace it, then as we put, I think it was in the reply brief, then the object of the conspiracy is a legal one. The conspiracy right is supposedly to launder money that was produced by some sort of unlawful activity. If you cannot trace the money that they were conspiring to launder here in the United States or transfer to the United States as some sort of unlawful activity, then by definition, then you don't have dirty money. So, yes, our position would be that it absolutely is essential to the conspiracy to show at least that there was some sort of unlawful activity from which this money was derived. And then there's a question. When you look at the depositions of Zhendong and they were presented at trial or Hongbin, none of them say that they ever conspired to bring money to the United States that they had taken from the Bank of China. Now, they may have said that they violated some regulations. They felt some of the loans may not have been done on the up and up. That's there, but they also say some other things. But what's never there is the connection from there to saying what the idea was is that we were going to take this money, then go to Hong Kong, and then bring it into the United States so that we could live like kings. That's not even there. As a matter of fact, Zhendong is asked about money brought to the United States for gambling. And he says, well, that was my own personal money. They're like, where did you get that money? He's like, it was money that I got as a shareholder from EverJoint. He drew a monthly salary. And he says, once we used that money, then we had an agent. I can't remember his last name, but I think it's Guopo Kuang was his name, who was an agent who would set up the rest of the money. And they've gambled basically on credit. And it was EverJoint's credit. And actually, he says, I don't even know who set it up, but Chaofan, my client, would work with this agent. They would work out the details. We would come to Vegas, and we would gamble. First, we'd use our own money. And when that money was gone, then we just used whatever the agent had set up. So there was never any idea in that co-conspirator's mind, supposedly, that what they were doing was taking money from the Bank of China, transferring it to Hong Kong, so that they could come here to the United States to gamble and somehow launder it or transfer these stolen funds. They were getting paid as shareholders. They were getting paid as bank managers. They were taking some of that money and investing it into the real estate, securities, and foreign exchange. You're the conspiracy guy, so I want to get all my conspiracy questions. Absolutely. All right. The other question I had is, I guess, why doesn't the defendant's continued use of the fraudulent passports and visas that were the target of the conspiracy, or at least that was alleged, demonstrate that there was a continuing existence of the conspiracy after the defendants arrived in the United States? Well, we talked about this last night. In my opinion, the government goes at it from the perspective that they somehow frustrated this conspiracy. But what they alleged was that the conspiracy, right, was to come to the United States and obtain that. So my point, at least, is they didn't frustrate it. The conspiracy, as far as the immigration crimes were concerned, was complete at the moment they entered into the false marriages and got their visas and their status and then came to the United States. It was done at that point in time. It wasn't that it was frustrated. Well, but the continued use of the fraudulent passports and the visas, why isn't that make the conspiracy continuing? I mean, they were here on those visas, were they not, that were fraudulent? They were. In 2001, yes, that's true. They did come on those fraudulent visas under the assumed names. That's absolutely true. And I guess the only thing- But the question is, as long as they remained in the United States through each of those visas, was that part of the conspiracy? And that is the part that I would say is no. They did not allege that as part of the conspiracy. The conspiracy they alleged was to obtain these things so they could escape, which they did, and they came to the United States, and they were here. But they didn't use those visas or passports afterwards while they were here to do anything else. They did come to the United States with those visas, absolutely, and that's what the evidence showed. And they entered into those false marriages in the 90s, 94, 95, around that time period. Then they obtained their- But they maintained their presence here under those visas, did they not? They absolutely were here, that's true. Yep, and that's how they entered was with those visas. So was there an allegation that the conspiracy continued as long as they used those visas? Is that the argument then that the conspiracy continued because they used those visas? Was that in the complaint or in the argument? Not that I'm aware of, no. I don't know of anything. One, they didn't use the visas as far as I know, or passports afterwards. They did come with those, they were here under that identity, at least as far as I know. I think they may have even had English names at the time that they were arrested. But certainly, I don't know of any proof or allegation that after they came here, they used or continued to use, or it was the plan to continue to use these visas and passports to do other things. I've got six minutes, and I don't know if you have any questions that you wanted, either Mr. Graham or Mr. Bowers, to address jury instructions and depositions or the expert testimony issues. I have a question on the RICO, is that you? Yep. I guess post-Morrison, there seems to be consensus, or we have to be mindful of post-Morrison and how to apply the RICO extraterritorial application. And so I'm curious, I'd like to know your position. Do we look at the enterprise or the location of the predicate acts to try to determine whether the extraterritorial application of RICO should apply? I think our position that we laid out in the brief is that you don't take a look at the predicate acts, because of course the predicate acts, as like in this case, the transferring money, laundering, immigration, those are all things directed at the United States and they're here. But the allegation in charge number one is a conspiracy to violate the RICO, and the predicate acts. And what's the authority for looking at the predicate acts? Our position is there is none for looking at the predicate acts. You don't look at the predicate acts. You say you don't look at the predicate acts. That's right. I'm sorry. You look at RICO, and that the RICO statute one clearly does not say, Congress does not say in there that it reaches extraterritorially. RICO one was, secondly, was to curtail, basically, organized crime here in the United States, and it's worded as such. I think we cited in the brief where we even italicized that the purpose that Congress pointed out was to curtail organized crime here in the United States. And so, when you're talking about RICO, you could get these guys for the predicate acts, but certainly not for, like I said, the RICO, because it doesn't reach extraterritorially, and nothing that they did over there. And so, is this RICO conspiracy foreign or domestic? I'm sorry, what? Is this foreign or domestic conspiracy? Is this a RICO conspiracy foreign or domestic? I mean, how do we categorize it? Well, I think that the conspiracy they allege in RICO was to defraud the Bank of China, which is foreign. But then, what they claim was, as predicate acts, were these money laundering, money transferring, and the visa and passport frauds. That's at least my understanding of that. I don't know if that, yeah. There's three and a half minutes left. Okay. May it please the court. Ronald Chang for the United States. With regard to the RICO conspiracy and the underlying acts that were alleged and proven at trial, we take a very different view than the defense as to what was proven. We submit that what was proven to the jury was that there was a longstanding scheme to defraud the bank of a substantial amount of money. And that during the course of this activity, there was, as well, another part to the scheme, which was to obtain status for each of the defendants, as well as their co-conspirator, Zhendong Yu, and his wife, Xuhui Yu, in the United States through false marriages. There was also entry into the United States to gamble with the proceeds of this offense, and ultimately, when the fraud was discovered in 2001, all of the defendants, including the two co-conspirators, fled to the United States where they remained until the arrest of the four The indictment did allege that the defendants remained in the District of Nevada and elsewhere in the United States, and this is at the end of count one in subparagraph I. But you state, I think, in the complaint that the object of that conspiracy was just to exit China, how does remaining not go beyond the goal of the conspiracy? Well, it was alleged that members of the enterprise and their associates used the various documents, immigration documents, to illegally enter and remain in the District of Nevada and other places in the United States. That furthered the conspiracy because they were able to avoid apprehension in China for their offenses, and as was proven at trial, indeed, upon their arrest. The conspiracy would last forever as long as they stayed in the United States. Well, that theoretically might have been possible, but in this particular case, there were acts that showed that they were still interested in retaining the proceeds of their fraud. At each of the residences, searches show that there were substantial amounts of cash. I assume they would always be interested in retaining the proceeds. There always is. Whether that interest is realized or not, I think, depends on the fraud. But in any case, I see Your Honor's point. I think the real issue here is, what did the defendants do during the course of the conspiracy up to the time that they had fled? We submit that the evidence is very, very different from what counsel's submission has been. In particular- The question is that the Rico Enterprise was located in China. It had, it certainly started there, and it had substantial effects in the United States that warranted the exercise of jurisdiction. We would submit that this is not simply a question of extraterritoriality, but whether or not the statutes as applied here had, were sufficient to vindicate the interests of the United States, as opposed to wholly extraterritorial conduct, such as a drug transaction between Southeast Asia and China, for instance. In this particular instance, there was not only the fraud, but the attempts, the successful attempts by the defendants to obtain status in the United States through fraud, as well as the movement of the monies into the EverJoint companies and then to the United States. It was, the point was made during the defendant's opening submission, that in fact, this activity was legitimate. There was sufficient evidence in the record for the jury to conclude that this money was not. Yu Dong testified that, in fact, the money that came through were the proceeds of the fraud. And even the money that was used for the real estate investment by EverJoint in China was used with the proceeds of the fraud. As far as the so-called business dealings between EverJoint and companies within China, the testimony of Rob Morris, the forensic accountant, showed that there was no basis for these transactions. That, in fact, what was happening was EverJoint had cash flow that was many times greater than the actual receipts that could be demonstrated on the accounting records that did exist for so-called legitimate transactions. Oftentimes, these amounts of legitimate transactions were as little as 15% to 20% of actual cash flow through the companies. And at one point, the flow was as large as 1.7 billion Hong Kong dollars, or about $200 million U.S. in a single year. Based on this testimony from both the forensic accountant, as well as Chen Dong-Yu, as well as the head of accounting at the Kaiping branch, Mr. Hongbin Yu, there was evidence for the jury to conclude that not only was there a fraud, but that the enterprise that was set up at EverJoint was not legitimate and was simply a conduit for funds. Assuming that that's all in the evidence, why isn't that a separate conspiracy to steal money from the Bank of China in China, invested in EverFraud in China, and so on, and then have a separate conspiracy to defraud the immigration authorities and to violate immigration law and set up sham marriages and sham property entities in the United States? It would be a separate RICO offense in the United States without getting into the extraterritorial question of what business have we got under RICO to worry about who's defrauding whom in China? The Chinese are competent in dealing with their problems like that, and RICO, what authority do you have that RICO has any business applying in the internal criminal activity going on in China? Well, the one that's the money which is looted, eventually, the looters hope to bring back over here where they can spend it without the watchful eye of China. Well, I think that's a significant point, actually, Your Honor, because not only was it done on one occasion, it was done on numerous occasions. There was the attempt upon the flight to wire over several million dollars to a relative in San Francisco. There were the numerous transactions in which money was sent over. Speaking of that, can you trace the money that was in the EverJoint account? Can you sort out what is clean money and what's dirty money that's moving around in the EverJoint account?  And can you trace the money that's being looted in these wireless transactions or wired transactions? Well, I think as far as a transaction-by-transaction tracing, no, that is not possible. But the point that we want to make with regard to the conspiracies is, to prove the necessary agreement for the money laundering and the 2314 offense, tracing is not the exclusive mechanism to prove that offense. Not only in Rutgard, but in subsequent cases, including the case cited by the defense in the reply, it is also sufficient to show that the business from which the money comes is not legitimate. And that would be the case here. There was proof through the testimony of Chen Dongyu as well as through Mr. Morris that, in fact, the whole purpose of the EverJoint company was simply a conduit for the transfer of legitimate proceeds, given the circular transactions, the wide disparities in funds flowing through the companies as opposed to legitimate volume, as well as the amounts that were seemingly owed to the Bank of China on EverJoint's books, but were not supported by any legitimate documentation. In fact, the only documentation that was found had indicia of fraud as testified to not only by Mr. Morris, but also by Mr. Qi Jiangli of the Bank of China, who was one of the forensic accountants who testified at trial and was able to testify as to those indicia. So we believe that is important, and it shows that the whole scheme is bound together, as Mr. Chen Dongyu testified, that the whole purpose of the immigration fraud was to provide an out for the defendants in case the scheme was discovered. And this was something that was entered into in the mid-'90s. This was not done on the spur of the moment in 2001. And so that is why we believe that, in fact, it is properly considered as a single conspiracy. There was a point that was made as to whether or not the object of the conspiracy has any sort of bearing upon the conspiracy itself for purposes of the so-called extraterritoriality issue. We would submit that the Court's decisions in Chua Han Mo as well as Cotton warrant the examination of the object of the conspiracy. Cotton was a 371 conspiracy charge based upon fraud committed overseas in connection with military procurement. And the argument was made that the 371 charge did not properly apply. This Court held that under the circumstances of the alleged object, it was proper to consider that for purposes of jurisdiction. The same point was made in Chua Han Mo, relying upon Cotton. In, by way of inference, the same point is made by the Supreme Court in the Ford decision, a conspiracy to violate the Prohibition laws in the 1920s. Well, post-Morrison, it seems like there is consensus building, at least in the context that RICO does not have extraterritorial application, does not have extraterritorial application. And so I guess I'm trying to figure out, do we have to decide that RICO has extraterritorial application in order to affirm here, or is there some other way? And do we look, I'll ask you the same question I asked defense counsel, do we look at the enterprise or the predicate acts? I think there are three parts to the question. The first is that this is not necessarily an extraterritorial, pure extraterritorial question in the sense of purely foreign conduct. Here, the acts that were proven up at trial had substantial impacts upon United States interests in terms of the money laundering, in terms of the immigration fraud offenses, and the various other types of conduct that the defendants engaged in while in the United States, or at least intended for the United States. The second point is, as the point that was made in the briefs is, I believe that it is the underlying object offense that is relevant here. It is certainly possible to conceive of a 371 or a RICO charge that it's based upon purely foreign conduct without any type of connection to the United States. But in this particular instance, the predicate acts, the predicate objects that were alleged, have that necessary tie to the United States as well. So I believe that in this particular instance- Object of it is to steal money from the Bank of China. The incidental object, or the ancillary object, or whatever you want to call it, was to flee to the United States to protect the theft. Well, it could certainly, certainly that is a plausible reading. But to understand the flight to the United States, the movement of the monies to the United States, it's still necessary to prove to the jury the underlying theft. Otherwise, these things don't have any proper context. And so it's necessary to prove that to the jury. Well, there are lots of crimes, you know, that people commit that don't have to be prosecuted under RICO. There are, I mean, I'm sure there are crimes that were committed that they could have been prosecuted for. The passport fraud, the visa fraud, all of those crimes are subject to prosecution in the United States. You know, wonderful prosecutors love RICO. But it doesn't replace all the crimes. I mean, if you were to decide that the principal crime here is to commit crimes overseas, to defraud the Bank of China, and to amass all that money, you could well say, okay, if they committed crimes in the United States, prosecute them. But it doesn't have to be a RICO prosecution. It may or may not be. It may be that you can charge individual crimes. But in this particular instance, because of the various ways that the testimony fit together in terms of coming to the United States in order to avoid prosecution for the crimes in China, we believed it was necessary in order to frame the charges in this fashion. In response, I did want to make one point with regard to the Morrison issue. And that is, we do maintain that there is a difference between civil and criminal here, for the points made in our brief, that courts after Morrison in examining the criminal context have relied upon Bowman. And have said, because of Bowman, the criminal context is different. And the presumption that is adverted to in Morrison does not necessarily apply. In addition, Morrison itself distinguished Pasquantino, a case applying the wire fraud statute to an attempt to evade Canadian tax laws. And the court made clear that the wire fraud statute in that case was much broader than the 10B security statute at issue there, which was limited to fraud directed to an American exchange. That limitation is not present with the various crimes here. And in fact, as we tried to lay out, the 1956 C-7 underlying activity. The state and international transport of stolen funds, as well as the immigration offenses, all have a basis for a connection to the acts that were alleged here. So the point that we do want to make is, we do take a very different view of the evidence as opposed to that made by the defense. We do believe that there was substantial proof of a fraud here. The final point that I do want to make is that, with regard to the difference between a conspiracy and the substantive offense. This court held in Posey, which was cited in the defense's reply, that it is quite possible theoretically to conceive of a situation where the substantive offense cannot be proven, but there nevertheless is a conspiracy because there is a requisite agreement to commit an unlawful act. We don't believe this Court needs to go that far in this particular instance. Scalia, you have a case where an incomplete crime that is never, it's never completed, but there is a conspiracy to try to get away with it. And we believe that case is Posey. As this Court held in Posey, and as was cited in the brief, that was an Arms Export Control Act prosecution involving a conspiracy, and the actual object could not have been accomplished because, in fact, the good was on the requisite list. That happens a lot in these sting cases where they get a sting and then the ultimate crime can't possibly happen, but there was an effort or an attempt or a plan or a concealment. And that's what we're saying happened here. Even if you accept all of what the defense argues as far as tracing is concerned, there was that agreement. You have that through the testimony. Other than the inferential evidence, I mean, the inferences are pretty strong. But what kind of direct evidence do you have of anybody agreeing to anything? That was Yu Zhendong's testimony. Certainly, he testified that by the time of 2001, when it was pretty clear that if they remained in China, they would be prosecuted, they made an effort to go to Hong Kong to clean out their accounts, to take money with them, to wire money over, and this was proceeds of the fraud. That was all part of his testimony. You certainly, of course, have that corroborated through the actions of the defendants in moving the families out into the United States and the various attempts to try to get other folks involved to help them do that. That's pretty well established, the immigration fraud or the immigration violations, but and maybe a conspiracy to commit those crimes. But that could be a completely separate enterprise. It could be, and the jury could have made that conclusion. And but based upon what was shown to them, they determined that the conspiracy that was alleged was proven, and we would submit that there was sufficient evidence to make that finding. So you're saying there was direct evidence of counts two and three? We believe so, that there was evidence that this money, through Yu Zhendong's testimony, that there was an effort to bring the money over and that they knew that this money was a product of a fraud. But even if one discounts that, there certainly is substantial inferential evidence that that's what they intended to do. After all, in 2000 and 2001, defendants Chao Fanxu and Guo Junxu both used their false passports in connection with registering at casinos in Las Vegas, so that all of this is tied together and is evidence demonstrating their participation in the fraud. I see that I'm near the end of my time. If there are not further questions on this or other issues, I'll submit on the argument. I guess I had one question on the sentencing. The relevant conduct on the Bank of China, was that directed toward the United States? It was. Certainly there was that portion that was, but I don't believe that there necessarily needs to be a finding that the entirety of it has to be directed to the United States. I don't believe there was necessarily that finding. What was directed? I guess help me understand what was directed toward the United States, because that makes a big difference in the amount of money that was ultimately involved here and that was the basis for the sentencing. You have the various transactions where the defendants either moved or tried to move money to the United States, and of course you have the whole underlying $482 million fraud, of which the part that was transported was a portion. But we believe, based upon cases like Fereal from the Seventh Circuit, that it is appropriate to examine conduct outside the United States in making a determination of relevant conduct, as well as- The Second Circuit, didn't they warn against doing that in Aziz? When conduct is exclusively external to the United States, there was certainly that holding in Azim. However, in subsequent cases, the Second Circuit, we believe as well as the Seventh Circuit, held that it was appropriate to consider that conduct. And just tell me why that bank fraud wasn't exclusive to China then. It wasn't exclusive to China because there was an attempt to move that money out, first to Hong Kong and then portions of it to various places around the world, including to the United States, both for purposes of the gambling as well as to keep it when the defendants fled, as is demonstrated by the money that was found in their residences. So we believe that there was sufficient evidence for the district court to conclude, under this clear and convincing standard that it applied, that that money could all be counted as relevant conduct for purposes of sentencing. Thank you. Thank you, counsel. Good morning. Judge, you'll be here the full four minutes. Thank you, Your Honor. You're all exactly right. We've hit on really the crux of what the argument is, is that we really do have two conspiracies here. And the one that the government seeks to bootstrap everything else to is this so-called conspiracy within, started within the Bank of China. But let's look at how that started. What's undisputed by the evidence is that what that started with was bad investments, and then trying to cover the bad investments. There was foreign, they were investing in foreign currency, and the currency market went south on them. So the question is, and this is what it comes to, is whether our RICO statute here in the United States was being properly used in this situation. Because really what the thing is, is that the money that was supposedly lost by the Bank of China, and we made a really strong point about this in our brief, is there's a question of loss and there's a question of theft. And loss is bad investments, money that was maybe invested improperly, and that money never left China. That money went from one hand to another within the Bank of China. It went from one hand to another between the Bank of China and its trading partners. It went from one hand to another and never left Hong Kong. So the question is, and a very key question is, how does that affect the United States and how, because the object of this RICO has to be, at least in part, how does it harm the United States? Because that's what RICO is designed to do. That's what that statute is designed for. So the question is, is what comes to the United States? Literally the only thing the government was able to prove at trial was that about $3 million came to the United States. That's what was gambled in Las Vegas, and that's the couple hundred thousand dollars maybe in jewelry and money that was found in one of the couple's homes. The government has continually argued this morning that they all had it, they all had it, they all had it. Well, that's not true, and their own evidence showed that that wasn't true, is only one of the couples had some money and they had some jewelry. The other company, I mean, the other couple, in fact, my client and his wife, had nothing. And that was really, that again shows the weakness in this conspiracy theory of this overwhelming agreement and that they're living large or they're living here in the United States because in answer to Your Honor's previous question about the continuing and I rob a bank, we don't get caught for five years, well, then do we have a five-year conspiracy because we didn't get caught on that one bank robbery? No, that's not how the law works. But that's how the government has to have this case work, or they can't tie in RICO and they can't tie in the conspiracy. So the immigration, at least part of that, is that they became naturalized citizens, some of them, when they came here. I want to talk about just a couple other points that were asked. There was a discussion that the government made that money was not legitimate in any way, shape, or form. Well, some of that money came from the overdraft account from a whole different bank, not the Bank of China, came from a whole different bank through EverJoint. EverJoint did have legitimate interest. It made product, it sold material, and it built a hotel and it built a building. It did have legitimate interest. There was some money there. Their expert, Rob Morris, made the comment that there was no basis, the government says there was no basis for the transactions. But Mr. Morris was unable to figure out where any of the transactions came from. In large part, he admitted that he had no idea where money went and where money came from, and that wasn't what he had. I am out of time, but the only other thing that I would offer to you is that when the government argues that Mr. Morris said it was not legitimate and that EverJoint was simply a conduit, that's not true. And so the tracing requirement that Your Honors ask about, we think that we've sufficiently argued the basis of why that is necessary. Obviously, we've not wanted to not address any of our other issues, and we maintain all of those, but we're all out of time. So thank you. Thank you very much for the argument. Very interesting, and you'll hear from us sometime. In the meantime, we'll be in recess for the day. All rise.
judges: Goodwin, Reinhardt, Murguia